UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND

| | | |
|---|---|---|
| STEVEN J. WOODS, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 0: 22-52-HRW |
| | ) | |
| v. | ) | |
| | ) | |
| LEMASTER, Warden, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Federal inmate Steven Woods indicates that he has an enlarged prostate gland and a "shy bladder," the latter meaning that his anxiety causes him difficulty when trying to urinate in the presence of others.  [D. E. No. 1-1 at 8]  So when he was ordered to provide a urine sample for drug testing at the prison in March 2021, Woods states that he was unable to produce one.  This is so even though Woods was given eight ounces of water to drink, and then was given two hours after that to provide the sample.  *Id*. at 2-3.  The Bureau of Prisons officer who was administering the test contacted the prison's medical department, but the responding nurse told him that "there is no medical reason why Woods could not be able to provide a urine sample in the two hour time limit."  Woods was then charged in Incident Report 3480529 with refusing to provide a urine sample.  *See* [D. E. No. 1-1 at 1]

During a hearing on the charges, the Disciplinary Hearing Officer ("DHO") noted that this was Woods's first disciplinary offense since he began his prison

1

sentence.  He also acknowledged Woods's statement that his enlarged prostate gland may have played a role in his asserted inability to produce a sample.  Nonetheless, the DHO found Woods guilty of the charged offense and imposed various sanctions, including the loss of good conduct time.  *See* [D. E. No. 1-1 at 3]  Woods appealed, but the BOP's Central Office affirmed the conviction over Woods's assertion that his shy bladder prevents him from "urinating upon demand."  *Id.* at 5-6.

An inmate who refuses to provide a urine sample is put on the BOP's "Prior Act List."  Those on the list must be tested every month until they have no drug-related offenses for 24 consecutive months.  *See* BOP Program Statement ("PS") 6060.08 § 9(b) (Nov. 24, 1999).  Woods was tested again one month later in April 2021, but again he did not produce a urine sample.  Woods was charged a second time with the same offense.  During the investigation, Health Services Administrator Brian Baler sent an e-mail to the investigators indicating that "there is no documentation in Woods's medical record of a clinical condition that would prevent him from giving a urine specimen for drug screen. I do feel he is experiencing a shy bladder. Even with a shy bladder, he should be able to provide a specimen within the allotted time." (cleaned up).  The charging entity – the Unit Disciplinary Committee – still referred the charge to a DHO for decision, but recommended that the charge be expunged because it "does not believe inmate Woods is refusing but may have a non medical condition / reason."  Notwithstanding the UDC's

2

recommendation, the DHO found Woods guilty of Incident Report 3493949, and again imposed sanctions including the loss of good conduct time.  [D. E. No. 1-1 at 15-19]

In the months following, Woods worked with a psychologist and medical staff to practice relaxation techniques to make it easier to provide a urine sample, with some success.  Even when Woods was not able to provide the required volume of urine, BOP staff were generally able to perform the drug tests, which produced negative results.  [D. E. No. 1-1 at 20-25]  In October 2021, Woods filed an informal motion in the trial court requesting compassionate release based upon these circumstances.  The sentencing judge denied relief, but sent a letter to the warden requesting that he look into the situation.  [D. E. No. 1-1 at 9-11] Nonetheless, in January 2022 Woods was charged for a third time with failing to provide a urine sample.  However, the DHO in that case expunged the charge on medical grounds. [D. E. No. 1-1 at 7, 12-14]

Woods now seeks habeas corpus relief from his first disciplinary conviction.[1] [D. E. No. 1]  Woods argues that his shy bladder and enlarged prostate gland made

---

[1]    At one point Woods suggests that he seeks relief from his second conviction as well.  *Id*. at 10.  But this conflicts with his repeated focus upon only his first conviction.  *Id*. at 2, 7, 9.  And his petition indicates exhaustion of administrative remedies only with respect to his first conviction.  *Id*. at 2-3.  The Court therefore limits its decision to Woods's first disciplinary conviction, while noting that its reasoning would apply to the second disciplinary conviction with equal force.

it difficult or impossible to provide the required sample.  He also contends that PS 6060.08 improperly requires staff to charge an inmate with refusing to provide a urine sample if they do not produce one within two hours, whereas its enabling regulation - 28 C.F.R. § 550.31 - states only that staff should "ordinarily" charge the inmate. Woods also complains that he was not allowed to spend eight hours in a "dry room" to provide a urine sample as PS 6060.08 permits.  *See Id*. at 6-7, 9-10.  The Court screens the petition before proceeding further.  28 U.S.C. § 2243; *Alexander v. Northern Bureau of Prisons*, 419 F. App'x 544, 545 (6th Cir. 2011).

The Court, while sympathetic to Woods's plight, will deny the petition.  When a prisoner believes that he was deprived of sentence credits for good conduct without due process of law, he may invoke this Court's habeas corpus jurisdiction under 28 U.S.C. § 2241.  *Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973).  Before such credits are taken, due process requires that the inmate be given:

(1)  written notice of the charges against him at least 24 hours before the administrative hearing on the charges;

(2)  a hearing before an impartial decision-maker;

(3)  assistance from a competent inmate or staff member, if the inmate requests one and he will likely be unable to present a defense because he is illiterate or the case is too complex for him to comprehend;

(4)  the opportunity to call witnesses and present documentary evidence, if doing so would not jeopardize institutional safety or correctional goals; and

4

> (5)    a written statement by the hearing officer explaining the evidence relied upon and the basis for the decision.

*Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974).   The Bureau of Prisons has included these and even broader protections by regulation.  *See* 28 C.F.R. §§ 541.5 - 541.8; BOP Program Statement 5270.09 (Nov. 2020).   However, an agency's failure to strictly comply with its own policies does not violate due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); *United States v. Rutherford*, 555 F.3d 190, 192 (6th Cir. 2009) ("[T]he Constitution does not demand a bright-line rule whereby every breach of federal administrative policy also violates the Due Process Clause.").

Due process also requires the prison disciplinary board's decision to be supported by "some evidence" in the record.  *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985).   Because the quantum of evidence required to meet that standard is minimal, the reviewing court need not re-examine the entire record, independently assess the credibility of witnesses, or weigh the evidence.  Instead, it need only confirm that "there is *any evidence* in the record that could support the conclusion reached by the disciplinary board."  *Id*. at 454-55 (emphasis added); *Selby v. Caruso*, 734 F. 3d 554, 559 (6th Cir. 2013).

Woods's first contention is that he did not refuse to provide a urine sample, but that his anxiety and medical conditions impeded his ability to provide one.  This amounts to a challenge to the sufficiency of the evidence to support the conviction.

As noted above, the Court's review of the DHO's determination is narrowly circumscribed: the only question is whether there is any evidence before the DHO that would permit a rational decisionmaker to conclude that the offense was committed. *Hill*, 472 U.S. at 454-55. At the first disciplinary hearing, the DHO had only Woods's self-reported shy bladder to support his claimed inability to produce a urine sample. On the other hand, Woods had been given eight ounces of water to drink when the test started, and was given two hours produce a small urine sample. In addition, the prison's medical department reported that there was nothing in Woods's medical history to indicate that he could not provide a urine sample within two hours. *See* [D. E. No. 1-1 at 1-3] This remained true during the second disciplinary hearing one month later. During those proceedings HSA Baler indicated that "even with a shy bladder, [Woods] should be able to provide a specimen within the allotted time." [D. E. No. 1-1 at 19] The DHO therefore had ample evidence to conclude that Woods had refused to provide a urine sample and therefore was guilty of the disciplinary offense. Woods's disciplinary conviction was therefore consistent with constitutional protections.

Woods's arguments based upon the applicable Program Statement fare no better. Even if the BOP had failed to follow guidance contained within its internal policy documents, no constitutional violation would follow. *Loudermill*, 470 U.S.

at 541.  But the BOP did not run afoul of its guidelines, and Woods's claims based

upon their provisions fail on their own terms. The pertinent language states:

> a. Staff of the same sex as the inmate tested shall directly supervise the giving of the urine sample.  If an inmate is unwilling to provide a urine sample within two hours of a request for it, staff must file an incident report.  No waiting period or extra time need be allowed for an inmate who directly and specifically refuses to provide a urine sample.  To eliminate the possibility of diluted or adulterated samples, staff shall keep the inmate under direct visual supervision during this two-hour period, or until a complete sample is furnished.  To assist the inmate in giving the sample, staff shall offer the inmate eight ounces of water at the beginning of the two-hour time period.  An inmate is presumed to be unwilling if the inmate fails to provide a urine sample within the allotted time period.  An inmate may rebut this presumption during the disciplinary process.
>
> Ordinarily, an inmate is expected to provide a urine sample within two hours of the request, but the Captain (or Lieutenant) may extend the time if warranted by specific situations (for example, the inmate has a documented medical or psychological problem, is dehydrated, etc.).
>
> Staff may consider supervising indirectly an inmate who claims to be willing but unable to provide a urine sample under direct visual supervision.  For example, this might be accomplished by allowing the inmate to provide the sample in a secure, dry room after a thorough search has been made of both the inmate and the room.  A urine sample is considered to be approximately a full specimen bottle. Refer to Standard Procedures for Collecting Urine Surveillance Samples (Attachment A).

BOP Program Statement 6060.08 (Nov. 24, 1999).

Woods is correct that the PS directs staff to file an incident report if an inmate

fails to provide a sample within two hours, whereas the applicable regulation

provides that staff should do so only "ordinarily." *See* 28 C.F.R. § 550.31.  But

7

Woods does not explain how this distinction has any bearing or negative impact upon his particular case. After all, the officer involved did not, in fact, charge him immediately after two hours had passed. Instead, the officer contacted the medical department and confirmed that Woods had no condition which would explain his failure to provide a urine sample. In sum, the officer actually followed the regulation rather than the Program Statement. Woods also ignores language in the Program Statement which provides that during the disciplinary process the inmate may rebut the presumption that he intentionally refused to provide a urine sample. In effect, the Program Statement merely shifts the point in time when officials determine whether the inmate intentionally refused to provide a sample, from the time of the initial charging decision to later in the disciplinary process after additional information – including the inmate's medical history – can be considered. The Program Statement is therefore neither inconsistent with or unfaithful to the terms of the enabling regulation.

Woods's next argument, ironically, seeks relief based upon language that is present in the Program Statement but that is not found in the enabling regulation at all. Ordinarily, the testing officer must keep a direct eye on the inmate who must provide a urine sample. The Program Statement indicates that if an inmate affirmatively indicates that he is "willing but unable" to provide a urine sample while being watched, the officer may – but need not – monitor him "indirectly." This may

be accomplished, for example, by first thoroughly searching the inmate and then placing him in "a secure, dry room" until he produces a urine sample.  PS 6060.08 § 9(a).

    But Woods did not tell the officer performing the drug screen that he was "willing but unable" to provide a urine sample.  Rather, the first time Woods suggested that a medical condition might have affected his ability to produce a urine sample was a day later during the UDC's investigation of the charge.  *See* [D. E. No. 1-1 at 3]  Woods was therefore not denied any accommodation.  And, in any event, the Program Statement affords testing staff the option – not the obligation – to provide alternative arrangements for inmates to provide a urine sample.  In sum, the actions of the BOP and its staff during the testing process and subsequent disciplinary proceedings did not run afoul of its own Program Statement.

    The foregoing analysis indicates that the BOP did not act improperly when it imposed disciplinary sanctions.  Woods is therefore not entitled to habeas corpus relief.  As previously noted, the Court's review of the BOP's actions during disciplinary proceedings is narrow and limited.  Thus the Court's denial of relief does not amount to an endorsement of the BOP's previous handling of the information then before it, nor a suggestion that BOP staff could not have done more to accurately assess Woods's willingness to provide a urine sample under more accommodating conditions.  Still, recent events indicate that prison medical and

psychological staff are engaging in better and more complete communications with the BOP officers involved in making disciplinary determinations.   Woods is encouraged to continue working with all involved parties to reduce the likelihood that events like those complained of here will recur in the future.

Accordingly, it is **ORDERED** as follows:

1.      Woods's petition for a writ of habeas corpus [D. E. No. 1] is **DENIED**.

2.      This action is **STRICKEN** from the Court's docket.

This the 25th day of July, 2022.

**Signed By:**

**Henry R Wilhoit Jr.**

**United States District Judge**